UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| CRYSTAL LANGFORD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 3:05-cv-159 |
| ) | (Guyton) |
| GATLINBURG REAL ESTATE & ) | |
| RENTAL, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment [Doc. 28]. This matter came before the undersigned for a hearing on June 22, 2007 on the defendants' motions for summary judgment [Docs. 86, 89, 92] and the motion to exclude the testimony of the plaintiff's expert [Doc. 106]. Participating on behalf of the plaintiff Crystal Langford was attorney Travis E. Venable. Participating on behalf of the defendant Gatlinburg Real Estate & Rental Co., Inc. ("GRE") was attorney Steven E. Marshall. Participating on behalf of the defendant Hawkeye Manufacturing, Inc. ("Hawkeye") was attorney Charles G. Taylor, III.

I. **Factual and Procedural Background**

This is a diversity action brought under Tennessee products liability law. The plaintiff Crystal Langford alleges that a hot tub that was installed at her vacation home

malfunctioned on March 24, 2004, causing a fire which destroyed the premises. The plaintiff brings suit against the manufacturer of the hot tub, Hawkeye, alleging that the hot tub was a defective or unreasonably dangerous product and that Hawkeye should be held strictly liable for its defective and dangerous condition. [Amended Complaint at ¶¶ 10-13]. The plaintiff also brings suit against GRE, the property manager, which the plaintiff alleges had conducted a full investigation of the property and "had notice of the defective condition that they allowed to remain and as such are liable under the strict liability laws in Tennessee." [Id. at ¶ 15].[1]

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiff. In doing so, the Court relies on the depositions of the plaintiff Crystal Langford and several employees of the defendants, and other testimony and exhibits filed with the Court.

The plaintiff leased her two-story vacation home, located at 1124 Crites Court in Gatlinburg, Tennessee, to the defendant GRE. [Amended Complaint at ¶2]. Pursuant to this agreement, GRE was responsible for handling rentals of the home, as well as maintaining the electrical equipment and the hot tub. [Id. at ¶3].

In 2000, the plaintiff purchased a hot tub through Bee Spas, a local hot tub retailer. The hot tub was manufactured by Hawkeye. Hawkeye only manufactured the "shell" of the hot tub, and various components, such as the pump, heater, and jets, were made by others. [Deposition of

---

[1] The plaintiff also brought suit against the seller and installer of the hot tub, Alton Lewis, Lee Ann Lewis, and Dee R. Lewis d/b/a Bee Spas (collectively "Bee Spas"), as well as the manufacturer of the ground fault circuit interrupter, Square D Company. These defendants have already been dismissed from this action.

Alton Lewis ("Lewis Dep.") at 94-95]. Hawkeye did not supply the various components needed to install the hot tub or to maintain it over the years. [Id. at 139, 142].

Bee Spas installed the hot tub on the plaintiff's property on April 11, 2000. [Id. at 131]. The installation of the hot tub involved the owner of Bee Spas, Alton Lewis ("Lewis"), sliding the hot tub onto a concrete slab and connecting the wiring for the hot tub. [Id. at 130-32]. As part of the installation, a third-party carpenter built a raised wooden deck around the hot tub, fully enclosing it. The deck was attached to the house. [Id. at 131-32].

Hawkeye had no involvement in the installation of the hot tub, and all materials provided by Hawkeye were installed in the plaintiff's home no later than April 12, 2000. [Id. at 139, 142]. No warranty work was ever required on the hot tub, and no one from Hawkeye ever came to the plaintiff's property. [Id. at 134]. The hot tub was not in a fenced area and thus was subject to tampering by renters of the plaintiff's property, as well as by the general public. [Id. at 136-38].

Approximately two years after the installation of the hot tub, Lewis returned to service the hot tub. [Id. at 134-35]. After his first service call in 2002, Lewis continued to service the hot tub periodically. Additionally, personnel from the defendant GRE provided housekeeping and cleaning services to the hot tub and the plaintiff's property. Employees of GRE drained the hot tub and cleaned it after each guest's stay, a procedure which involved manipulating components of the hot tub. [Deposition of David Dixon ("Dixon Dep.") at 17]. GRE employees sometimes cleaned the hot tub filter, which required its removal. [Id. at 36]. GRE employees were instructed to keep the water level a little bit above the jets. [Id. at 35]. GRE did not provide a written policy or training to its employees on how to clean the hot tub. [Id. at 18].

Lewis testified that there is a rubber O-ring on the filter, the purpose of which is to prevent water from leaking from the hot tub. He stated that if the filter was not positioned properly, the O-ring could be chipped, thereby causing the hot tub to leak. [Lewis Dep. at 40]. Lewis noted that the O-rings on the plaintiff's hot tub required replacement more than the average hot tub usually required. [Id. at 42].

According to the report of the plaintiff's expert, Samuel J. Sero ("Sero"), maintenance records reveal that the O-rings on the hot tub leaked repeatedly and had to be replaced on September 19, 2001, August, 17, 2002, June 9, 2003, and February 13, 2004. On March 21, 2002, Bee Spas employees noted on an invoice that "all jets [were] turned off and pump air locked." On an invoice dated April 5, 2002, Bee Spas noted: "Tub was low on water and pulling air through the filter forcing pump to air lock. All jets turned off. Note: This is the same problem as before." [Sero Report at 2].

Sero has a Bachelor of Science degree in electrical engineering from the Carnegie Institute of Technology. He is the owner of Renaissance Engineering, a consulting firm. Sero is a registered P.E. in Pennsylvania, and is a member of several organizations, including the Pennsylvania Association of Arson Investigators, the International Association of Arson Investigators, and the National Fire Protection Association. [Sero C.V. at 1, 5-6]. Since 1989, Sero has engaged in private forensic engineering consulting for litigants and insurance companies in several areas, including electrocutions, fires, workplace injuries, and consumer product-related injuries. From 1975 to the present, he has engaged in private consulting on electrical, plumbing, and mechanical systems design and operation. He has served as an instructor for seminars on building

4

operation analysis, electricity, lightning and its effects, and fire causation in vehicles. [Id. at 1-3, 5].

In a report dated August 29, 2006, and in a subsequent affidavit dated August 31, 2006, Sero notes that the hot tub had a history of repairs, including the replacement of GFI units that burned out on at least two occasions and the replacement of O-rings that leaked repeatedly and had to be replaced, but that no in-depth analysis of these malfunctions was ever performed. In his affidavit, Sero summarizes his opinions as follows:

> The effect of a leaking O-Ring is to cause the tub to lose water. The most critical aspect of any hot tub or spa is that it not be allowed to operate without water. In this condition heating and material ignition can occur from both the pump and the heating elements.
>
> Although requested of the manufacturer, no design and construction or operational manuals or drawings were ever supplied for this unit by the manufacturer and thus I could not determine what the failure mode or modes of this spa were or which may have occurred in this fire.
>
> It is my opinion, based upon my examination of the fire scene, evaluation of the evidence and documents to date and within a reasonable degree of engineering certainty, that the fire originated in the James Deluxe spa and was caused by an unwanted heating of the combustible materials of the spa due to a malfunction of some component or components of the spa.

[Sero Affidavit at ¶¶ 9-11].

Additionally, Sero opines in his August 29, 2006 report as follows:

> The repairs which were made prior to the fire are indicative of the creation of the two hazardous conditions for this type of spa, loss of water and pump overload. The failure by Bee Spas, or any other service technician, to evaluate the spa operation for what caused the failure of a GFCI contributed to the spa being the cause of this fire.

[Sero Report at 3].

5

At his deposition, Sero testified, in pertinent part, as follows:

Q: All right . . . . There's another statement in here where you say "the invoice states, found all jets turned off and pumped [sic] air lock[ed]." Can you tell us how that contributed in any way to a fire?

A: Being overheated under that condition. If the pump is air locked and hasn't kicked out because it's just sitting there trying to still operate, the impeller would be in a locked rotor mode and we're going to then have excessive overheating of the motor.

Q: And we know at that point – well, at least we know it was air locked twice, correct?

A: Yes.

Q: Before this fire; is that right?

A: Right.

Q: And neither time caused a fire, correct?

A: That's correct.

Q: All right. And it is your testimony, so I'm clear, that if the pump's air locked that it would overheat sufficiently to cause a fire?

A: Given a long enough period of time and if there aren't any thermal breakers to kick in and out, if it's an automatic thermal breaker, what's going to happen is that the pump will overheat, the thermal overload will then kick out until the motor cools down, then it'll kick on again. If the motor is still locked, then it'll run up the heat again, then back and forth, back and forth.

The problem with that kind of thing and why I made a point about nobody bothered to find out what caused all this is that the damage that it does every time it overheats is irreparable, which means that it gets worse and worse and it's going to be easier to start a fire the next time, and the next time after that, the next time after that. That's why it's so important to find out what caused this in the first place.

[Deposition of Samuel J. Sero ("Sero Dep.") at 42-43].

Sero testified that he believed the origin of the fire was the hot tub, stating: "I know that the origin is the spa. Exactly what component in the spa did it, [I] can't tell you because it could also be whatever was burning up the GFIs." [Id. at 47]. Sero testified that the cause of the fire could have been the water pump overheating, the internal wiring, or a combination of factors. [Id. at 47]. Sero testified that he was unable to reach a conclusion regarding the specific cause of the fire because he was not supplied complete information on the components of the hot tub. He testified that he asked plaintiff's counsel to obtain documentation regarding the spa, including any drawings for the unit and installation and maintenance history:

> I don't know any of that because it's been destroyed and no one bothered to tell me -- to get me information. And I don't think it wasn't like no one bothered to, I know that the attorneys I'm working for tried really hard to get it but they were told it doesn't exist anymore.

[Id. at 46].

Sero admitted that he did not know how much water was in the spa at the time of the fire or whether there was water in there at all. [Id. at 47]. He also did not know if there was a leaking O-ring at the time of the fire. [Id. at 47-48]. Sero admitted that he did not conduct any independent testing on any of the components of the hot tub. [Id. at 52]. He admitted that he did not know whether a trespasser could have tampered with the hot tub. [Id. at 82]. Sero further testified that he did not know who furnished the allegedly defective component or components or whether the component or components were defective at the time that they left the manufacturer. [Id. at 84].

Casey Murray, a sales manager for Hawkeye, testified that none of the departments in Hawkeye had any drawings, externally or internally of this hot tub, and that no one at Hawkeye had the knowledge to draw the internal components and how they worked together. Murray stated

7

that the only information they would have for this particular hot tub would be a picture on a brochure. However, he did state that this particular hot tub, the "James Deluxe" model, had an "overload protection," the purpose of which was to shut off the motor if it reached a certain temperature. [Deposition of Casey Murray ("Murray Dep.") at 11-12].

The plaintiff brought this litigation on March 22, 2005, against GRE and Bee Spas. [Doc. 1]. On July 25, 2005, the plaintiff filed an amended complaint, adding Hawkeye and another defendant (who has since been dismissed) to the action. [Doc. 21].

## II. The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52; see also Gaines v. Runyon, 107 F.3d 1171, 1174-75 (6th Cir. 1997) (requiring non-moving party "to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial" in order to defeat summary judgment).

### III. Analysis and Ruling

#### A. Hawkeye's Motions for Summary Judgment

Hawkeye moves for summary judgment on two separate grounds. First, Hawkeye argues that the plaintiff's claim is barred by Tennessee's statute of repose governing actions involving improvements to real property. [Doc. 86]. Second, Hawkeye argues that the plaintiff's products liability claim must fail because the plaintiff cannot prove that the hot tub at issue was in a defective or unreasonably dangerous condition at the time that it left Hawkeye's control. [Doc. 89]. The Court will address each of these arguments in turn.

### 1. Statute of Repose

Hawkeye first moves for summary judgment on the grounds that the plaintiff's claim against it is barred by Tennessee's statute of repose governing actions involving improvements to real property. The Tennessee Products Liability Act of 1978 (the "Act"), provides the following statute of limitations:

> Any action against a manufacturer or seller of a product for injury to person or property caused by its defective or unreasonably dangerous condition must be brought **within the period fixed by** §§ 28-3-104, 28-3-105, **28-3-202**, and 47-2-725, but notwithstanding any exceptions to these provisions it must be brought within six (6) years of the date of injury, in any event, the action must be brought within ten (10) years from the date on which the product was first purchased for use or consumption, or within one (1) year after the expiration of the anticipated life of the product, whichever is the shorter . . . .

Tenn. Code Ann. §29-28-103(a) (emphasis added). The above-referenced section, Tenn. Code Ann. § 28-3-202, provides, in pertinent part, as follows:

> All actions to recover damages for any deficiency in the design, planning, supervision, observation of construction, or construction of an improvement to real property, for injury to property, real or personal, arising out of any such deficiency, . . . shall be brought against any person performing or furnishing the design, planning, supervision, observation of construction, construction of, or land surveying in connection with, such an improvement within four (4) years after substantial completion of such an improvement.

Additionally, Tenn. Code Ann. § 28-3-203 provides, in pertinent part, as follows:

> (a) Notwithstanding the provisions of § 28-3-202, in the case of such an injury to property or person, . . . which injury occurred during the fourth year after such substantial completion, an action in court to recover damages for such injury . . . shall be brought within one (1) year after the date on which such injury occurred . . . .
> 
> (b) Such action shall, in all events, be brought within five (5) years after the substantial completion of such an improvement.

In the present case, Hawkeye argues that Tenn. Code Ann. § 28-3-202 operates to bar the plaintiff's products liability claim against Hawkeye because Hawkeye manufactured and supplied the "materials" (*i.e.*, the hot tub) used in the "construction of an improvement" to the plaintiff's real property. In so arguing, Hawkeye relies upon <u>Jefferson County v. Celotex Corp.</u>, No. C.A. 48, 1987 WL 16421 (Tenn. Ct. App. Sep. 3, 1987), <u>perm. app. denied</u>, Nov. 23, 1987, and <u>Graves v. Grady's Inc.</u>, No. 03A01-9708-CV-00336, 1998 WL 8669 (Tenn. Ct. App. Jan. 13, 1998), <u>perm. app. denied</u>, June 1, 1998.

The Court finds that neither of these cases is dispositive of the issue presented in this case. In the <u>Celotex</u> case, the plaintiff sued, among others, the manufacturer of the roofing materials, for the construction of a defective roof. All of the defendants, including the manufacturer, asserted Tenn. Code Ann. § 28-3-202 as a bar to the plaintiff's claim. The plaintiff, in turn, alleged fraudulent concealment by the manufacturer of a defect in the roofing materials. The issue on appeal was whether fraudulent concealment of a design, material, and/or construction defect exempted the plaintiff from the applicable period of limitation. The Court concluded that the plaintiff had failed to create a genuine issue of material fact regarding fraudulent concealment, and thereby affirmed the trial court. <u>Celotex</u>, 1987 WL 16421 at *2. Notably, no party raised the issue of whether the manufacturer of the roofing materials was in fact properly entitled to assert Tenn. Code Ann. § 28-3-202, and the Court did not address it.

In <u>Graves</u>, the plaintiff was injured when the booth she was occupying at the defendant restaurant collapsed. She sued the general contractor, and later amended her complaint to add the manufacturer of the booth to the action. The manufacturer asserted Tenn. Code Ann. § 28-3-202, and the trial court granted summary judgment. The plaintiff appealed, arguing that Tenn.

Code Ann. § 20-1-119, the Tennessee savings statute, operated to grant the plaintiff additional time to allege a claim of comparative fault, thereby making the plaintiff's amended claim against the manufacturer timely. The Court of Appeals affirmed the grant of summary judgment, holding that the statute of repose applied to the manufacturer and was unaffected by operation of § 20-1-119. Graves, 1998 WL 8669, at *3. Again, however, the issue of whether the manufacturer of supplies used in the construction of an improvement to real property is entitled to assert § 28-3-202 was not an issue that was raised in that case, and thus, the Court of Appeals did not address this issue.

The Court of Appeals did address the issue, however, in the published decision of Pridemark Custom Plating, Inc. v. Upjohn Co., 702 S.W.2d 566 (Tenn. Ct. App.), perm. app. denied, Nov. 25, 1985. In that case, the lessor and lessee of a factory brought suit against the foam insulation manufacturer and insulation contractor, for damages resulting from a fire in the factory. The foam insulation manufacturer, Upjohn, asserted Tenn. Code Ann. § 28-3-202, arguing that as the developer and manufacturer of the insulation, it was a party to the "design" of "an improvement to real property" within the meaning of the statute. Upjohn further argued that the statute was applicable because an Upjohn representative was present while the insulation was installed and that this constituted "observation of construction" within the meaning of the statute.

The plaintiffs argued that Tenn. Code Ann. § 28-3-202 was not applicable because Upjohn was merely supplied materials to the construction job and thus was not intended to be covered by a statute designed to protect architects and builders. The trial court agreed with the plaintiffs that Upjohn was merely a materials supplier and therefore could not rely on the statute. Upjohn appealed.

The Court of Appeals agreed that Tenn. Code Ann. § 28-3-202 did not apply to Upjohn. Specifically, the Court noted that "[t]he products liability statute indicates the intention of the legislature that the time period of four years fixed by 28-3-202 apply to manufacturers furnishing component parts of an improvement to real property *if the manufacturer is otherwise within the scope of that statute*." Pridemark, 702 S.W.2d at 570 (emphasis added). Accordingly, the Court went on to analyze Upjohn's assertion that it was involved in the "design" or "observation of construction" of the improvement. Id.

The Court rejected Upjohn's contention that it was involved in the "design," noting that "Upjohn's polyurethane foam insulation is a product on the market for general use in a variety of situations and was not specifically designed for the building involved in this litigation." Id. The Court noted that it did "not interpret 'design' as used in the statute to mean the general design of a manufactured product which might be used in improvements to real estate. The meaning of the word is limited to the architectural or engineering design of a particular building or the particular parts thereof." Id.

With respect to the "observation of construction," the Court found that "[p]utting the manufacturer who observes the installation and integration of its products into the construction of buildings in the same category as an architect and the builder is a reasonable construction of the statute." Id. The Court therefore held "that the manufacturer or seller of a product installed in and becoming a part of the real property in connection with the improvement thereof is covered by the time period referred to in T.C.A. § 28-3-202 *if the manufacturer observes the installation of its product during the construction*." Id. (emphasis added).

13

As the Court of Appeals' decision in <u>Pridemark</u> indicates, a manufacturer of materials may be entitled to the protection of Tenn. Code Ann. § 28-3-202, but only if the manufacturer can show that it was involved in the "design, planning, supervision, observation of construction, or construction of" the improvement. The undisputed facts in this case show that Hawkeye can satisfy none of these prerequisites. Like the foam insulation in <u>Pridemark</u>, the hot tub manufactured by Hawkeye was a "product on the market for general use in a variety of situations and was not specifically designed for the building involved in this litigation." <u>Pridemark</u>, 702 S.W.2d at 570. Accordingly, the Court cannot find that Hawkeye was involved in the "design" of the improvement. Nor can the Court find that Hawkeye was involved in the planning, supervision, observation of the construction of, or construction of the improvement, as the undisputed evidence shows that no representative of Hawkeye was present at any time during the installation of the hot tub. For these reasons, the Court concludes that Tenn. Code Ann. § 28-3-202 is not applicable to Hawkeye. Accordingly, Hawkeye's First Motion for Summary Judgment [Doc. 86] must be **DENIED**.

        **2.**      **Proof of Defective or Unreasonably Dangerous Condition**

Hawkeye also moves for summary judgment on the grounds that the plaintiff cannot prove that the hot tub was in a defective condition or unreasonably dangerous at the time it left Hawkeye's control. In order to recover against a manufacturer or seller, the Act requires the plaintiff to prove that the product was "in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller." Tenn. Code Ann. § 29-28-105(a). The Act defines a "defective" condition as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29-28-102(2). The Act defines "unreasonably dangerous" as a product

14

> dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

Tenn. Code Ann. § 29-28-102(8). "These statutory definitions essentially codify the 'consumer expectation test' as the basis in Tennessee for assessing products liability." Tatum v. Cordis Corp., 758 F. Supp. 457, 461 (M.D. Tenn. 1991).

The burden is on the plaintiff to identify a defect in the product. Coffey v. Dowley Mfg., Inc., 187 F. Supp. 2d 958, 967 (M.D. Tenn. 2002), aff'd, 89 Fed. Appx. 927 (6th Cir. 2003). In cases involving a piece of machinery, a plaintiff must produce expert testimony in order to prove a defect in the machinery. See Whaley v. Rheem Mfg. Co., 900 S.W.2d 296, 301 (Tenn. Ct. App. 1995) ("The workings of a heat pump are beyond the common knowledge of laymen. To explain how such a piece of machinery works, one needs 'special knowledge, skill, experience, or training.'") (quoting Tenn. R. Evid. 701).

Additionally, the plaintiff must show that the alleged defect in the product was both the proximate cause and the cause in fact of the plaintiff's injury. Pride v. BIC Corp., 218 F.3d 566, 580 (6th Cir. 2000) ("In order to recover under the Act, the plaintiff has the burden of showing that the alleged 'defect in the product [was the] cause in fact of the injury.'") (quoting Wyatt v. Winnebago Indus., Inc., 566 S.W.2d 276, 281 (Tenn. Ct. App. 1977)); Whaley, 900 S.W.2d at 300 ("It almost goes without saying that the identified product defect must be the proximate cause of the plaintiff's injury."). The mere fact that an injury or damage occurred is not proof that the product is defective. Coffey, 187 F. Supp. 2d at 967.

In the present case, the plaintiff conceded at the summary judgment hearing that the only proof that she has to establish that an alleged defect in the hot tub caused the fire is the testimony of the plaintiff's expert, Samuel Sero. Sero opined that "that the fire originated in the James Deluxe spa and was caused by an unwanted hearing of the combustible materials of the spa due to a malfunction of some component or components of the spa." [Sero Affidavit at ¶¶ 9-11]. Sero, however, cannot identify in what manner the hot tub was defectively designed or manufactured. Nor can Sero specifically identify the particular component or components of the hot tub that malfunctioned and therefore were allegedly defective. Further, Sero cannot identify whether these components were defective when they left Hawkeye's control. [Sero Dep. at 84]. Finally, Sero admitted that he could not reach a conclusion regarding the specific cause of the fire. Nevertheless, Sero testified that he believed the origin of the fire was the hot tub, stating: "I know that the origin is the spa. Exactly what component in the spa did it, [I] can't tell you . . . ." [Id. at 47].

Sero's testimony fails to establish that a particular defect in the hot tub caused the fire in this case. To opine that the fire originated in the hot tub is simply not sufficient; it is not enough to prove that some type of injury or damage occurred. See Coffey, 187 F. Supp. 2d at 967. Rather, the plaintiff must establish, through the use of expert testimony, that some specific defect in the product was the proximate cause of the fire. Viewing the evidence in the light most favorable to the plaintiff, the Court finds that the plaintiff has failed to do so. The plaintiff's failure to establish that a specific defect in the hot tub rendered it defective or unreasonably dangerous and caused the fire requires the dismissal of her product liability claims against Hawkeye. See Masters v. Rishton, 863 S.W.2d 702, 706 (Tenn. Ct. App. 1992), perm. app. denied, Feb. 22, 1993 ("We find

16

that the plaintiffs' inability to put on proof which would show that there was a defect in the helmet which caused it to come off Richie Masters' head during the accident forecloses all claims by the plaintiffs against [the defendant] under either an implied warranty or strict liability theory of recovery.").

Sero testified in his deposition that he was unable to render an opinion on the specific cause of the fire because he was not supplied complete information on the components of the hot tub:

> I don't know any of that because it's been destroyed and no one bothered to tell me -- to get me information. And I don't think it wasn't like no one bothered to, I know that the attorneys I'm working for tried really hard to get it but they were told it doesn't exist anymore.

[Id. at 46]. The plaintiff also argues in her response brief that Sero was unable to determine the failure mode of the hot tub because, "although requested, no design, construction or operational manuals were supplied by Hawkeye." [Doc. 96-2 at 3]. However, the alleged failure of the defendant to produce such documents does not excuse the plaintiff's lack of proof of causation. The record does not indicate that any formal discovery request was made for such records. If such a request were made, the record does not reflect that the plaintiff pursued any type of motion to compel the production of such records. Nor has any allegation been made that these documents were intentionally destroyed, an allegation, which if found to be true, may give rise to a rebuttable presumption that the destroyed documents were unfavorable to the defendant. See McDaniel v. Transcender, LLC, 119 Fed. Appx. 774, 782 (6th Cir. Jan. 31, 2005). In any event, such lack of documentation did not preclude Sero from examining other James Deluxe hot tubs in order to

17

examine the internal components of the product and thereby presumably learn the same type of information that he could have obtained from drawings of the internal components.

For the foregoing reasons, the Court finds that, based upon the undisputed facts, the defendant Hawkeye is entitled to a judgment as a matter of law. Accordingly, Hawkeye's Second Motion for Summary Judgment [Doc. 89] is **GRANTED**.

### B. GRE's Motion for Summary Judgment

The defendant GRE also moves for summary judgment [Doc. 92]. For grounds, GRE argues: (1) that the plaintiff's Amended Complaint fails to state a cause of action against GRE; (2) that the plaintiff has not proven that any act or omission by GRE was the cause in fact of the fire; (3) that the plaintiff has not proven that any act or omission by GRE was the proximate cause of the fire; (4) that the plaintiff has not proven that GRE violated any duty to the plaintiff; and (5) that the plaintiff has not proven that the fire was reasonably foreseeable as a result of any act or omission by GRE.

The plaintiff opposes GRE's motion, arguing that GRE owed a duty to the plaintiff to properly maintain the property, and to have its agents service the hot tub in a manner that would not create harm to the hot tub or its components. The plaintiff contends that the facts presented through the deposition testimony of various witnesses shows that agents of GRE manipulated components of the hot tub, created defects in the O-rings, that they completed these actions on multiple occasions without further investigation, and that their actions were a cause in fact of the resulting fire on March 24, 2004. [Doc. 97].

As a preliminary matter, the Court notes that the plaintiff's Amended Complaint alleges various product liability theories against the defendants, including GRE. However, it is

18

undisputed that GRE is neither the manufacturer nor the distributor of the subject hot tub. On this basis alone, the Court finds that summary judgment in favor of GRE would be proper. See Tenn. Code Ann. § 29-28-105 (authorizing products liability action against a "manufacturer or seller of a product" that is determined to be in a defective or unreasonably dangerous condition).

Even if the plaintiff's Amended Complaint could be construed as asserting a negligence action against GRE, the Court would still find that summary judgment is proper. The plaintiff's claim against GRE suffers from the same fatal defect as the plaintiff's claim against Hawkeye: the plaintiff has failed to establish the actual cause of the fire which she alleges originated in the hot tub. Sero was unable to identify any act or omission on the part of GRE that caused the fire in this case. While the plaintiff argues that the evidence establishes that "if the O-ring on the hot tub is damaged by improperly putting the filter back into the hot tub, the result is the hot tub will leak, and if the water travels below the jets then it can result in the internal components of the hot tub overheating." [Doc. 97 at 10], there is no evidence in the record to suggest that any agent of GRE in fact caused damage to any of the O-rings or that the O-ring in place at the time of the fire was in fact damaged at all. Further, there is no evidence in the record to show that the hot tub was leaking or that the water in the hot tub had traveled below the jets at the time of the fire. Without some evidence to support this factual predicate, the plaintiff's theory of how the overheating of the hot tub motor may have occurred is simply speculation. The plaintiff has failed to create a genuine issue of material fact as to whether any act or omission by GRE was the proximate cause of the fire. Absent proof on this issue, the plaintiff cannot establish an essential element of a negligence claim against GRE. For these reasons, the defendant GRE's Motion for Summary Judgment [Doc. 92] is **GRANTED**.

### IV. Motion to Exclude Testimony of Plaintiff's Expert

In light of the Court's ruling on the defendants' motions for summary judgment, GRE's Motion to Exclude Plaintiff's Expert Testimony [Doc. 106] is moot and is therefore **DENIED AS MOOT**.

### V. Conclusion

For the foregoing reasons, the Court finds that there are no genuine issues of material fact and that the defendants Hawkeye and GRE are entitled to judgment as a matter of law. Accordingly, it is hereby **ORDERED**:

(1) The First Motion for Summary Judgment Filed by Hawkeye Manufacturing, Inc. [Doc. 86] is **DENIED**;

(2) The Second Motion for Summary Judgment Filed by Hawkeye Manufacturing, Inc. [Doc. 89] is **GRANTED**;

(3) Defendant Gatlinburg Real Estate & Rental Co, Inc.'s Motion for Summary Judgment [Doc. 92] is **GRANTED**; and

(4) Defendant Gatlinburg Real Estate & Rental Co, Inc.'s Motion to Exclude Plaintiff's Expert Testimony [Doc. 106] is **DENIED AS MOOT**.

**JUDGMENT TO FOLLOW.**

ENTER:

    s/ H. Bruce Guyton
United States Magistrate Judge